# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# WESTERN DIVISION

| | |
|---|---|
| Angel Michelle Rose Luna, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 14 CV 50317 |
| ) | Magistrate Judge Iain D. Johnston |
| Carolyn W. Colvin, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## **MEMORANDUM OPINION AND ORDER**

Plaintiff Angel Michelle Rose Luna brings this action under 42 U.S.C. §405(g), challenging the denial of social security disability benefits.

## BACKGROUND

In 2010, when she was 19 years old, plaintiff filed applications for disability benefits and supplement security income. She alleged that she has ongoing pain in her knee stemming from two surgeries, one in 2003 and one in 2004, and shoulder, neck, and back pain from a 2005 car accident. Dkt. #27 at 4. These problems continued and, in 2010, she had thoracic outlet surgery and first rib resection.[1] The surgery was performed by Dr. Zarnke who prescribed various pain medications. Dkt. #27 at 6. Plaintiff also has alleged that she suffers from anxiety and migraine headaches, the latter problem began around April 2011. In the summer of 2012, plaintiff began treatment with a neurologist, Dr. Lawrence Wilkin. *Id.* at 7. He prescribed pain medications for plaintiff's migraines, but they made her feel "foggy." In letter dated October 12, 2012, Dr. Wilkin opined that plaintiff had suffered severe and disabling pain "over the last eight years

---

[1] This procedure apparently involved removing a rib. *See* R. 404.

without any improvements" and that she is "completely and totally disabled from any occupation." R. 462.

On May 21, 2013, a hearing was held before an administrative law judge ("ALJ"). Plaintiff testified that she graduated from high school and had four months of college education; that she had two knee surgeries; that she was in a car accident in 2005 and another one in 2008; that she had surgery (performed by Dr. Zarnke, an orthopedist) in 2010; that she last worked as a nursing assistant but was fired in December 2009 for working "at a slower pace"; that she has shooting pain going from her left shoulder into her arm; that if she walks half a block it feels like her lung is caving in "where [her] rib is gone"; that Dr. Zarnke told her a few months after the surgery that there was nothing more he could do to address the pain; that she then saw Dr. McCarty, an orthopedist, who told her that she did not need any further surgery and that plaintiff was "going to [have to] live with" her problems; that she then began seeing Dr. Wilkin who "prescribed [her] a lot of medicine that's made it a lot better"; that she gets migraine headaches lasting anywhere from one to five days; that after she started taking Topamax for the headaches, they occurred once or twice a week; that she has two children, a one and five years old; that her mom and husband do most of the child care; and that she has trouble playing with her children.

During this testimony, the ALJ asked plaintiff about two alleged discrepancies that had "caught [his] attention" and would later become key anchor points in his ALJ's decision. R. 97. The first concerned a motorcycle ride. Here is the testimony, with the ALJ asking the questions:

> Q    Let me bring something to your attention. It's from August, of 2010. It's at Exhibit 3-F. It was when you were still going to the Pain Center.
>
> She happens to mention that you got pain from the top of the shoulder, the trapezius muscle, that went down to your waist. It stopped at the mid-biceps and the elbow; but it was the way that the specialist wrote it down that caught my attention.

She mentioned that you had the discomfort when you were riding a—on a motorcycle for a ride.

A    Yes.

Q    So I don't know if you remember saying that. []

CLMT:  Yes. I do remember saying that. My brother had got a new motorcycle.  He lives right across the street, and we live on a dead-end. He's, like, you know, do you want to get on and try to ride. I'm, like, well, okay. And we rode to the stop sign.

When I—his bike seat sat taller than his seat. So I'd have to lean down over him, and I couldn't do it. My arms started to shake. It sent a shooting pain from my elbow up the back of my arm and into my shoulder and one from rotator cuff up into my neck. It runs, like, right behind my ear.

Because she had asked what movements are worse, or have you noticed anything now than you had before.

BY THE ADMINISTRIVE LAW JUDGE:

Q    Okay.  So this is not something you were making a habit of; it just happened to be an isolated occasion. Correct?

A    Yes. My family was trying to find something that I would enjoy doing with the problems I had, and I couldn't do it.

R. 97-98.

The second alleged discrepancy concerned a driving trip to St. Louis. Again, because of the importance the ALJ placed on this issue, the Court will quote the testimony at some length:

BY THE ADMINISTRATIVE LAW JUDGE:

Q    Exhibit 2-F, page 4.

I'm going to read this note to you, ma'am. It's from Dr. Zarnke again.

A    Okay.

Q    June 2, 2010: "The patient is seen for follow up for her left thoracic outlet decompression. She traveled back and forth to Saint Louis because of her child's illness. She did a lot of driving and keeping her left arm elevated. She now has aching in her back and shoulder with some numbness in her third and fourth

fingers, similar to pre-operative state. It has gotten a little better since returning and not being so active."

I'm going to give you an opportunity to explain that discrepancy based on what you told me before.

A My daughter, her kidneys had started to fail on her. And me and my mom took her down to Saint Louis because they thought she had kidney cancer.

So I would drive, you know, anywhere from a half-hour to 45 minutes, if I could; my mom would switch; and we'd do that back and forth until we could get there and get home.

Q Well, that distance from your home in Rockford to, say, Saint Louis is probably going to be on the order of, say, what do you think six hours? Maybe eight?

A Six, close to there.

Q Okay. All right. So six hours one way. And you're going with your mom. Yes?

A Yes.

Q You didn't do the drive alone?

A No.

Q How often did you make the trip?

A We went twice.

Q Okay. And, again, this would be an isolated instance that I shouldn't attach too much importance to; correct?

A Correct. I wouldn't have drove her, but when you're looking at her and knowing she's sick and the only way to get her there is either you drive or she doesn't go and something—she dies or something worse, it really didn't leave me much choice. I would have done anything for her.

R. 105-06.

On July 8, 2013, the ALJ issued his decision finding plaintiff not disabled. He found that the following were impairments were severe: reflex sympathetic dystrophy involving the left

upper extremity; status post February 2010 left thoracic outlet syndrome release secondary to brachial plexopathy; and status post knee arthroscopies. However, he found that plaintiff's anxiety and headaches were not severe impairments because they caused only minimal functional impact.

The ALJ found that plaintiff did not meet any mental health listing. The ALJ evaluated the Paragraph B criteria, finding that plaintiff had only mild limitations in activities of daily living because she "appears to be taking care of a small child" and had driven to St. Louis "multiple times." The ALJ also noted that plaintiff rode on the back of her brother's motorcycle, "which again seems counter-intuitive for a severe anxiety restriction." R. 56. As for social functioning, the ALJ concluded that plaintiff had mild limitations, noting that she was cooperative when she applied for benefits, that Dr. Renzi described her as pleasant, that she "cares for small children," that she worked as a nurse's assistant and before that as a waitress, cashier, and hostess and "does not appear to have deteriorated since that time," and that "there is no history of formal mental health oversight." As for concentration, persistence or pace (the third criteria), the ALJ found that plaintiff had mild difficulties. The ALJ noted that Dr. Renzi "discerned normal mental status" at an evaluation. The ALJ also again pointed to the St. Louis trips: "An example of preserved concentration was manifest in multiple five-hour driving trips that the claimant managed to and from her residence to St. Louis." R. 56.

The ALJ found that plaintiff had the residual functional capacity ("RFC") to do light work, subject to a few minor restrictions. The ALJ began by focusing on three alleged inconsistencies in plaintiff's testimony: the St. Louis trip; the motorcycle ride; and supposedly contradictory statements about her ability to pick up her daughter. The ALJ then analyzed the objective medical evidence. The ALJ also concluded that Dr. Wilkin's opinion that plaintiff had

5

been disabled for the past eight years was inconsistent with her having worked in 2008 and 2009 and also was inconsistent with the observations of orthopedist David McCarty. The ALJ then considered plaintiff's anxiety, finding it was not a serious problem because (among other things) plaintiff had driven drove to St. Louis multiple times, making it "more probably than not that [plaintiff] did not provide [Dr. Renzi] with accurate and specific details concerning her functioning." R. 60. As for the migraines, the ALJ noted that plaintiff was taking medications; her symptoms were improving; and she had only been to the emergency room intermittently.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Moreover, federal courts cannot build this logical bridge on behalf of

the ALJ or Commissioner. *See Mason v. Colvin*, 2014 U.S. Dist. LEXIS 152938, at *19 (N.D. Ill. Oct. 29, 2014).

Plaintiff raises a number of arguments for remand. Although they are loosely grouped into a few larger categories, it is easier simply to list them. She alleges that the ALJ committed the following errors: (1) failed to consider that her recurring headaches would require her to miss work several days a month; (2) relied on the state agency doctors who rendered their opinions before any evidence relating to her headaches was placed in the file; (3) failed to consider medication side-effects such as grogginess; (4) failed to consider all of plaintiff's impairments in combination; (5) made an unfair distinction between plaintiff's statement that she could not lift her child and another that she had difficulty lifting her child; (6) placed undue weight on the St. Louis trips; (7) placed undue weight on the one motorcycle ride; (8) failed to give controlling weight to the opinion of Dr. Wilkin, her treating physician; (9) referred to only certain daily activities while ignoring others; and (10) failed to consider the written statements of her mom and husband describing her daily activities.

Several of these arguments can be grouped under one larger argument, which is that the ALJ erred in the credibility analysis. The Court will begin with this argument. An ALJ's credibility determination should be reversed only if it is patently wrong. *Minnick v. Colvin*, 775 F.3d 929, 937 (7th Cir. 2015). However, an ALJ's decision may be reversed if the ALJ "fail[s] to adequately explain his or her credibility finding by discussing specific reasons supported by the record." *Id.*; *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008) (a credibility finding "must be specific enough to enable the claimant and a reviewing body to understand the reasoning"). In addition, an ALJ's credibility finding will be reversed if it is based on an error of fact. *See Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (remanding because the ALJ's credibility

determination "misstated some important evidence and misunderstood the import of other evidence"); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006) (an ALJ may not base a credibility determination on "errors of fact or logic").

Here, the ALJ's credibility finding did not meet these standards. As noted above, plaintiff's credibility was the first issue addressed in the RFC discussion. The ALJ spent five paragraphs detailing three statements (the St. Louis trip, riding a motorcycle, unable to lift her daughter) that were supposedly at odds with her broader, more general claim of suffering ongoing severe pain. Based on these inconsistencies, the ALJ concluded that plaintiff in general was unable to "provide accurate and specific detail" about her symptoms. R. 58. Although later in the opinion the ALJ went on to evaluate the objective medical evidence and doctor reports, this initial determination cast a shadow over this analysis, raising the suspicion that the credibility finding became the tail wagging the dog. The problem, however, is that the credibility finding rests on shaky factual grounds.

The first inconsistency—the St. Louis trips—received the most attention. Based on how often it was mentioned, one could surmise that it was the central fact in the entire opinion. The ALJ devoted three paragraphs to it in the RFC discussion, far more space than given to any other fact or argument. By this Court's count, it was mentioned eight separate times, re-emerging throughout the opinion like a constant drumbeat. Although this fact was given such prominence, it turns out on closer examination to be a relatively minor, anecdotal observation and one that is not obviously a contradiction. The basic contention, as described by the ALJ, is that plaintiff "drove to St. Louis *multiple* times." R. 55 (emphasis added by the ALJ). However, the ALJ's rendering of this episode fails to fairly account for the context (the reason for the trips) and gives the misleading impression that plaintiff was routinely taking long car trips without difficulty.

8

Consider first the issue of frequency. The original source referring to the St. Louis trip was Dr. Zarnke's June 2010 note stating that plaintiff had recently "traveled back and forth to St. Louis because of her child's illness" and that she "did a lot of driving and [kept] her left arm elevated." R. 360. This note only referred to a *single* trip. At the hearing, the ALJ asked plaintiff how many of these trips she had taken, and plaintiff answered "twice." R. 106. However, in the opinion, the ALJ repeatedly used the open-ended adjective "multiple," even italicizing it for extra emphasis, thereby suggesting that the trips were more akin to a routine activity.[2]

Consider next the reason for these trips. At the hearing, plaintiff explained that she undertook the two trips for a compelling reason—to find medical treatment for her daughter who (according to plaintiff) had failing kidneys and might have kidney cancer. Plaintiff told the ALJ that "when you're looking at her and knowing she's sick and the only way to get her there is either you drive or she doesn't go and [] she dies or something worse, it really didn't leave me much choice. I would have done anything for her." R. 106. Although the ALJ referred loosely to this explanation, stating blandly that plaintiff "was concerned about her daughter's health," the ALJ gave it no weight in the analysis. This was an error. As the Seventh Circuit has repeatedly noted, parents can sometimes perform "heroic efforts" on behalf of their children, and an ALJ should not confuse these efforts with the day-in-day-out abilities of the claimant. *See, e.g. Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) ("The administrative law judge's casual equating

---

[2] The Government argues that the dictionary definition of "multiple" is merely "more than one," and therefore the ALJ's description was accurate. Dkt. #32 at 7 n.2. This may be true in a technical sense, but it ignores the rhetorical implication of using the vague phrase. The oath administered to witnesses in this Court asks the following: "Do you swear or affirm that all the testimony you are about to give in this case now before the Court will be the truth, the whole truth, and nothing but the truth?" The provision for "the whole truth" is important. Consider the following example. A parent asks their child at bed time, "Did you brush your teeth?" The child truthfully answers, "Yes." The parent then asks, "Did you brush your teeth today?" The child provides the whole truth and answers, "No." When the ALJ emphasized "multiple," it may have been the truth, but it was not the whole truth. It should be noted also that, although the ALJ consistently used the word "multiple" throughout the opinion to describe the trips, the ALJ at one point did acknowledge that plaintiff testified that there were only two trips. But this acknowledgement arguably made it look like plaintiff was being untruthful in claiming she only took two trips even though there is no evidence contradicting her claim.

9

of household work to work in a labor market cannot stand. Gentle *must* take care of her children, or else abandon them to foster care or perhaps her sister, and the choices may impel her to heroic efforts.") (emphasis in original).[3]

It was not just that the ALJ relied on the trip as evidence of plaintiff's day-to-day physical abilities, but that he also used it to find that plaintiff was not telling the truth. However, again, the ALJ relied on questionable inferences to reach the desired conclusion. As an initial matter, plaintiff never denied taking the two trips. The ALJ found a contradiction only by juxtaposing this truthful testimony with later testimony where plaintiff was asked about her typical weekly driving. Plaintiff stated that she drove "[j]ust short distances," doing things such as going to the gas station or grocery store. R. 89. The ALJ then asked her to estimate the length of time for these trips and plaintiff stated: "Ten minutes." *Id.* The context suggests that plaintiff was responding to questions about what she did on average during a normal week. However, later in his decision, the ALJ wrote that plaintiff testified that "she can *only* drive ten minutes at a time." R. 57 (emphasis added). The word "only" was inserted by the ALJ; it was not part of plaintiff's testimony. Plaintiff did not testify that she could never, under any circumstances, drive more than 10 minutes. When read in a reasonable way, plaintiff's statements are not contradictory. One statement (driving 10 minutes) related to her normal everyday abilities while another (driving to St. Louis) focused on a unique, compelling situation. Absent other evidence, this Court cannot with any degree of confidence find a valid basis for concluding that plaintiff was lying on this point. And the ALJ made clear that he believed that this one contradiction, by itself, was enough to justify the wide-reaching conclusion that plaintiff was "not able to provide

---

[3] Related to the above point, it is clear from Dr. Zarnke's note that, although plaintiff drove to St. Louis with her mother, this effort exacerbated her shoulder and arm problems, causing what he described as an "over-use" injury based on plaintiff having done "unusual things." R. 360. Unlike the ALJ, Dr. Zarnke did not view this type of trip as something plaintiff could, or should, do on a regular basis.

10

accurate and specific detail" about *any* of her symptoms or impairments. R. 58. Consequently, the ALJ invoked the dubious doctrine of *falsus in uno falsus in omnibus* (false in one, false in all). *See U.S. v. Edwards*, 581 F.3d 604, 612 (7th Cir. 2009).

The same general problems apply to the other two alleged inconsistencies. As for the motorcycle ride, the ALJ found that it was inconsistent with plaintiff's general statements that she was in pain and suffered from anxiety.[4] Here again, the ALJ gave no weight to context nor to the fact that this was not a regular activity. As plaintiff testified, she only rode on the motorcycle once, just after her brother bought it; the ride was short (just up to the stop sign on a dead-end street where she and her brother lived); and the ride "sent a shooting pain" into her shoulder and neck. R. 98. It thus does not reasonably follow that this one failed attempt at briefly riding on the back of a motorcycle was inconsistent with plaintiff's general claims of pain and anxiety.

The third alleged inconsistency was that plaintiff supposedly gave conflicting statements about whether she could lift her two-year-old daughter. The ALJ stated that plaintiff testified at the hearing that she "could not lift" her child but found that the medical record contained one reference to plaintiff stating that she merely was "having problems" lifting her child. R. 58. The Court finds that this alleged contradiction rests on ambiguous and brief testimony that "split[s] hairs unfairly" by relying on inconsistencies that "are so minor as to be immaterial." *Stage v. Colvin*, 812 F.3d 1121, 1126, n.1 (7th Cir. 2016). On this issue, plaintiff testified as follows: "I can't even hold my one-year-old son very often. If I do, he climbs on the couch to me." R. 97. These different verbal formulations all point to the same larger point, and do not show an obvious contradiction in this Court's view.

---

[4] The ALJ referred to this inconsistency several times. *See* R. 56 ("she was riding the back of her brother's motorcycle, which again seems counter-intuitive for a severe anxiety restriction"); R. 58 ("she rode on the back of her mother's [sic] motorcycle (3F/1), which seemingly is inconsistent with discomfort of this intensity").

11

In sum, it is thus far from clear that these three statements are even inconsistent, much less so inconsistent to draw an inference that plaintiff was lying. *See Hamilton*, 525 Fed. Appx. at 437 ("Testimonial inconsistencies can indeed form the basis of an adverse credibility finding, *see* SSR 96-7p, but Hamilton convincingly argues that she did not contradict herself."); *Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (remanding because the ALJ's credibility determination "misstated some important evidence and misunderstood the import of other evidence"). It is not merely that the ALJ relied on these dubious inconsistencies, but that he gave them so much weight. As noted above, the ALJ mentioned these inconsistencies—in particular the St. Louis driving trip—at almost every critical juncture in the opinion. It is true that the ALJ went on to analyze the objective evidence and to offer additional independent reasons to support the conclusion. But the problem is that the ALJ created the impression that his decision was a foreordained conclusion based solely on the credibility finding, which was given such prominence and repeated so often.

As for plaintiff's remaining arguments, the Court will only briefly comment on them given that these issues can all be considered anew on remand. Plaintiff asserts that the ALJ ignored or misconstrued evidence about her migraines. Plaintiff notes that she visited the emergency room four times for headaches lasting in some instances several days, that she suffers from migraines every one to three weeks, that Dr. Wilkin has prescribed medications but they make her "foggy" and unable to concentrate. Dkt. #26 at 9. Plaintiff complains that although the ALJ purportedly relied on the state agency consultants in discounting plaintiff's headache problems, those doctors rendered their opinions "prior to when the medical evidence [about her] headaches was included in the file." *Id.* at 10.

In response, the Government argues that the ALJ cited to several reasons for discounting plaintiff's headaches, including that she only "intermittently" visited the emergency room and that the headaches improved somewhat with medication. Dkt. #32 at 9; R. 60. However, the Government has not disputed plaintiff's argument that none of this evidence was reviewed by the State Agency doctors, nor by any other medical expert. On remand, this evidence should be considered by a medical expert to avoid the ALJ being placed in the role of playing doctor.

Finally, plaintiff argued that Dr. Wilkin's opinion that plaintiff was completely disabled (Ex. 18F) should have been given controlling weight because he was a treating physician. However, this argument was only raised fully for the first time in the reply brief. Moreover, the ALJ discussed Dr. Wilkin's opinion and gave several reasons for discounting it. Still, as this Court has consistently advocated, on remand, the ALJ *must* follow the two step process set forth in the treating physician rule when assessing Dr. Wilkin's and the other medical providers' opinions and in particular should explicitly apply the checklist of factors in doing so. Properly applying the treating-physician rule is not merely a suggestion. To be clear: Do it!

*    *    *

In remanding this case, the Court expresses no opinion on the ultimate outcome. To be found disabled on remand, plaintiff, who is a young woman, will have to overcome a number of legitimate questions that remain about whether her impairments would truly disqualify her from working full-time. The record contains substantial evidence that, if properly marshalled, could support the proposition that plaintiff is not disabled. But marshalling that evidence and making that decision is not this Court's function. The Government's well-written brief does a fine job detailing some of this evidence in support of its harmless error arguments. But, for the reasons

stated previously, the Court is not so confident so as to apply the harmless error doctrine to the ALJ's flawed credibility analysis.

## CONCLUSION

` For these reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

Date: August 17, 2016    By: _____
Iain D. Johnston
United States Magistrate Judge